**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**CLEVELAND TENNELL and WEST COAST LOADERS, LTD.**,

Plaintiffs,

v.

**BANK OF AMERICA, N.A.**,

Defendant.

Case No. 3:19-cv-1520-SI

**OPINION AND ORDER**

John D. Ostrander, William A. Drew, and Joel P. Leonard, ELLIOT, OSTRANDER & PRESTON, PC, 707 SW Washington Street, Suite 1500, Portland, OR 97205. Of Attorneys for Plaintiffs.

James P. Laurick, KILMER, VORHEES & LAURICK, PC, 732 NW 19th Avenue, Portland, OR 97209; Alicia Baiardo, MCGUIREWOODS, LLP, Two Embarcadero Center, Suite 1300, San Francisco, CA 94111; Ava Lias-Booker, MCGUIREWOODS, LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Before the Court are Plaintiffs' Motions to Compel and to De-Designate and Defendant's Motion for Protective Order. These related discovery motions require the Court to balance the scope and timing of relevant discovery demands by Plaintiffs against Defendant's obligations to protect: (1) the privacy of nonparty bank customers; (2) the health and safety of bank employees during this national health emergency caused by the Covid-19 pandemic; (3) the confidentiality

of bank security features; and (4) the privacy of a specific bank employee whose alleged actions and statements are the subject of this lawsuit. Defendant also advises that it will soon be filing a motion to challenge the standing of both Plaintiffs to bring their federal claim (but not their two state claims), and Defendant requests that Plaintiffs' discovery at issue in the pending motions be postponed until the Court resolves standing. As discussed below, the Court grants in part and denies in part the parties' respective motions.

## STANDARDS

Rule 26(b)(1) of the Federal Rules of Civil Procedure states the general scope of civil discovery in federal court. That rule provides, in relevant part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Rule 26(c)(1) allows a court to issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." As relevant here, that rule specifically allows a court to: forbid disclosure or discovery; specify the terms for disclosure or discovery; prescribe a discovery method other than the one selected by the party seeking discovery; and forbid inquiry into certain matters or limit the scope of disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(A)-(D).

## BACKGROUND

Plaintiff Cleveland Tennell ("Mr. Tennell") is the President and owner of Plaintiff West Coast Loaders, Ltd. ("WCL"). As alleged in the Amended Complaint, WCL is an Oregon

corporation that provides services for the loading or unloading of freight trucks and shipping containers at warehouses and distribution centers. Mr. Tennell is black, and more than 60 percent of WCL's employees are black. Mr. Tennell and WCL have been banking with Defendant Bank of America, N.A. ("Bank of America" or the "Bank") for approximately 20 years. During the morning of August 1, 2019, an incident occurred when Mr. Tennell visited the Bank of America branch located at 10120 NE Sandy Blvd. in the Parkrose neighborhood of Portland (the "Parkrose Branch") to make a deposit into WCL's business checking account. Based on that incident, Plaintiffs assert three claims against Bank of America. First, Plaintiffs allege that the Bank denied Plaintiffs their equal rights under the law, in violation of 42 U.S.C. § 1981.[1]

---

[1] That federal civil rights statute provides:

> (a) STATEMENT OF EQUAL RIGHTS
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "MAKE AND ENFORCE CONTRACTS" DEFINED
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) PROTECTION AGAINST IMPAIRMENT
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Second, Plaintiffs allege that the Bank intentionally inflicted emotional distress on Mr. Tennell. Third, Plaintiffs allege that the Bank denied Plaintiffs "full and equal accommodations, advantages, facilities and privileges" in a place of public accommodation because of Mr. Tennell's race, in violation of Or. Rev. Stat. ("ORS") § 659A.403. Precisely what happened at the Parkrose Branch during the morning of August 1, 2019 is in dispute between the parties. For purposes of the pending motions, the Court will state the facts as Plaintiffs allege them in their Amended Complaint.

In July 2019, the beginning balance of WCL's business checking account with Bank of America was $68,395.03. WCL made eight deposits and other credits to its account in the sum of $97,293.91. WCL made withdrawals and had other debits from its account in the sum of $77,584.62. WCL wrote checks against its account in the sum of $49,074.97. As of July 31, 2019, WCL had an ending balance of $39,017.35. WCL's banking pattern during July 2019 was typical of its pattern during the preceding several years.

During the morning of August 1, 2019, Mr. Tennell visited the Parkrose Branch to deposit checks. There were only two teller windows open, the branch was busy, and there was a line of customers waiting for service. One of the teller windows was staffed by a male teller named "Hector," whom Mr. Tennell had worked with in the past and found to be both efficient and pleasant. The other teller window was staffed by Ms. Denise Adair ("Ms. Adair"), who is white, whom Mr. Tennell understood to be the branch manager at the Parkrose Branch, and about whom Mr. Tennell had previously been told had harassed his black employees.

When Mr. Tennell got to the front of the line, the next opening was with the Ms. Adair. As he had done many times in the past, Mr. Tennell stepped forward to make a deposit into the WCL account. Mr. Tennell's deposit consisted of multiple large checks from well-established

commercial entities in two separate deposits (the sums of $6,839.00 and $24,375.00, respectively). Based on WCL's banking history over the years, the checks Mr. Tennell sought to deposit were unremarkable in all respects. During the past several years, Mr. Tennell often deposited checks in amounts greater than $20,000. Mr. Tennell completed the deposit slips in the same manner that he had done many times in the past.

When Mr. Tennell approached Ms. Adair with the deposit slips and checks, she was standoffish and unpleasant. To Mr. Tennell's surprise, she refused his deposit and did not allow him to place the deposit into WCL's Account. Ms. Adair did not give Mr. Tennell a reason for the refusal, despite his request. She simply said, "I am not taking these checks." Mr. Tennell gathered his checks and his deposit slips, retreated to the lobby area of the branch, where he studied his deposit materials to confirm that they were in order. He then entered the teller line again with the hope that he could do his banking with Hector. Unfortunately, when he got to the front of the line (for the second time), Ms. Adair was the next available teller. She again refused his deposit. Ms. Adair said to Mr. Tennell, "Didn't I tell you, I'm not giving you service" (or words to that effect). To Mr. Tennell's shock, she commented about the banking practices of "you people," which Mr. Tennell took to mean black people. Based on Ms. Adair's manner, facial expressions, body language, tone of voice, and turn of phrase, Mr. Tennell concluded that Ms. Adair bore a racially discriminatory hostility toward him (and his black-owned company). At all times, Mr. Tennell maintained a calm manner, and he asked why the Bank was refusing to accept his deposit. Ms. Adair did not answer his question.

Frustrated and humiliated, Mr. Tennell told Ms. Adair that he would like to withdraw all funds that WCL had on deposit with Bank of America. But Ms. Adair, Bank of America's manager at the Parkrose Branch, refused to honor Mr. Tennell's request. Ms. Adair then told

Mr. Tennell to leave the Bank and said that she was calling the police. She stated: "I'm telling you to get out of here. And, I'm calling 911" (or words to that effect).

Mr. Tennell complied with the order to leave the Parkrose Branch. He told Ms. Adair that he would wait for the police outside, as instructed. At no time did Mr. Tennell raise his voice, make any threat, or otherwise cause a disturbance. Mr. Tennell waited outside the front door of the Bank, in the August heat. While waiting, Mr. Tennell considered the insults and the racial discrimination he had just suffered. Mr. Tennell was also upset that he could not do his regular business. After about 15 to 30 minutes, during which the police did not arrive, Mr. Tennell again stepped into the Bank, waved to Ms. Adair, and asked whether the police were coming. Ms. Adair angrily pointed him back outside and grabbed the telephone. Mr. Tennell again peaceably stepped outside and waited for the police to arrive.

While continuing to wait outside, another bank customer, whom Mr. Tennell did not know, approached Mr. Tennell. She said that she had witnessed everything and that it was shameful how he had been discriminated against because of his race. The other customer then urged Mr. Tennell to leave. The customer said, "I can tell that you're good people; you don't need this" and explained that as a black man he was in danger when the police arrived. The customer said, "Son, bad things happen to black men these days when the police are called." After a brief additional wait, Mr. Tennell became anxious over the impending arrival of the police and left.

Mr. Tennell still needed to make his banking deposit as payroll was soon due, and he had many other things to do that day. He drove several miles to a different branch of Bank of America, in the Hollywood neighborhood of Portland. At that branch, he presented for deposit

the same checks and deposit slips refused earlier that morning by Ms. Adair at the Parkrose Branch. Mr. Tennell's deposit was accepted without issue.

Soon after, Plaintiffs successfully withdrew funds from Bank of America and closed one of their accounts and significantly reduced the holdings of the other, which was maintained only until certain WCL customers could modify their ACH deposit practices. At approximately that time, Bank of America's Vice President, Small Business Banker, Ms. Phuong Nguyen reached out to Plaintiffs to ask about the incident on August 1st. During that conversation, Ms. Nguyen acknowledged the racial injustice, stated that there were many problems at the Parkrose Branch, told Mr. Tennell that Ms. Adair was "awful" and in the wrong, and explained that Bank of America was planning to "get rid of her" but not until the end of the Third Quarter, which was September 30, 2019.

## DISCUSSION

### A. Overview of the Pending Discovery Disputes

Precisely what happened at the Parkrose Branch during the morning of August 1, 2019 is in dispute between the parties. In its Answer, Bank of America denies many allegations in Plaintiffs' Amended Complaint. In addition, in its memorandum in opposition to Plaintiffs' Motion to Compel and to De-Designate, Bank of America describes Mr. Tennell's accusations as "unfounded," and Bank of America asserts that Mr. Tennell "came into [the] Parkrose [Branch] that day agitated and looking for a fight." ECF 38 at 7 (internal page 6). In response, Mr. Tennell submitted a declaration in which he states that it is not true that he entered the Bank agitated and looking for a fight, adding:

> In fact, up and until the bank refused to serve me, August 1, 2019 was a very normal and pleasant day for me. I followed my daily routine of getting coffee, doing business paperwork, and talking to workers and customers. When I entered the Parkrose Branch of Bank of America, I was in a good mood and not in the least bit

> agitated. As far as looking for a fight, I have not ever in my adult life "looked for a fight."

ECF 42.

In discovery, Bank of America delivered to Plaintiffs, under a Protective Order ("PO") to which the parties stipulated (ECF 25), a video-recording that shows the inside the Parkrose Branch between 10:15 a.m. and 11:15 a.m. on August 1, 2019, including the incident between Mr. Tennell and Ms. Adair. The video, however, was recorded without audio. The video shows that there may be about 15 potential witnesses, not including bank employees, who may have seen and heard what happened between Mr. Tennell and Ms. Adair. Plaintiffs seek the opportunity to interview those persons and have requested records from Bank of America that may help Plaintiffs identify some of these potential witnesses. The records requested by Plaintiffs include documents showing which customers transacted business inside the Parkrose Branch during the relevant time as well as contact information for those customers. Bank of America objects.

The video provided by Bank of America to Plaintiffs also contains a still image (a photograph derived from the video) of Ms. Adair, but the Bank has designated the entire video, including the photograph, as "Confidential" under the PO. This designation has the effect of precluding Plaintiffs from showing that photograph to potential witnesses. At least one person in the Parkrose Branch that morning saw Mr. Tennell speaking with a bank employee described as a white woman. Plaintiffs submitted a declaration from this witness, Ms. Beverly Eubanks, and Ms. Eubanks' declaration supports Mr. Tennell's version of the incident. ECF 43 at 3. Plaintiffs' counsel would like to show the photograph of Ms. Adair to Ms. Eubanks and ask Ms. Eubanks whether the woman depicted in the photograph is the person whom Ms. Eubanks observed that morning speaking with Mr. Tennell. Bank of America objects.

Plaintiffs also submitted declarations from four other individuals. They are all employees or former employees of WCL, and they all reported having had problems at the Parkrose Branch of Bank of America that appeared to be based on racial or ethnic bias. *See* ECF 43 at 4-7. Three of these declarants specifically identified problems they had with a female white teller at the Parkrose Branch. Plaintiffs' counsel would like to show the photograph of Ms. Adair to these potential witnesses and ask them whether the woman depicted in the photograph is the person with whom they have had the encounters that they describe. Bank of America objects. Plaintiffs' counsel also would like to show the photograph of Ms. Adair to other potential customers who were in the Parkrose Branch at the time when Mr. Tennell was there on August 1st, if those customers can be identified and located. Bank of America objects.

Bank of America objects to producing any information about any of its other customers, arguing that federal and state privacy laws prohibit the Bank from doing so, at least without a court order. Bank of America also argues that identifying the potential customers who may have been in the Parkrose Branch during the relevant time is a labor-intensive project for its employees, many of whom are under stay-at-home orders because of the current Covid-19 pandemic health emergency. Bank of America further asserts that it will soon be filing a motion challenging Plaintiffs' standing to bring a federal civil rights claim under 42 U.S.C. § 1981 and that Bank of America should not be required to perform the labor-intensive work needed to identify bank customers who may be potential witnesses, at least until after the Court resolves Plaintiffs' standing to bring their federal claim. Finally, Bank of America maintains that the photograph of Ms. Adair came from the Parkrose Branch's security video and that general dissemination of that photograph would both jeopardize the Bank's security and embarrass and harass Ms. Adair. Although Ms. Adair is both a key witness and the managerial employee for

whose actions the Bank may ultimately be found responsible, she is not a party in this lawsuit. The Court will address each of the Bank's four arguments in turn.

**B. The Privacy Interests of Bank of America's Customers**

Both federal and state law provide important privacy protections of financial information. At the federal level, the relevant law is the Gramm-Leach-Bliley Act of 1999 ("GLBA"). 15 U.S.C. §§ 6801-6809. The GLBA was enacted to provide procedures for financial institutions: "(1) to insure the security and confidentiality of consumer records and information; (2) to protect against any anticipated threats or hazards to the security or integrity of such records; and (3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer." 15 U.S.C. § 6801(b). The GLBA requires a financial institution to give its customers notice and an opportunity to opt out of disclosure before releasing any customer's "nonpublic personal information to a nonaffiliated third party." *Id*. at § 6802. This opt-out requirement, however, is subject to several exceptions. *Id*. at § 6802(e). Relevant here, the Act permits the disclosure of nonpublic personal information "to respond to judicial process." 15 U.S.C. § 6802(e)(8). *See Marks v. Global Mortgage Group, Inc*., 218 F.R.D. 492, 496-97 (S.D. W.Va. 2003) (holding that "15 U.S.C. § 6802(e)(8) permits a financial institution to disclose the non-public personal financial information of its customers to comply with a discovery request"); *see also Fenske-Buchanan v. Bank of Am. N.A.*, 2012 Westlaw 2367124 at *2 (W.D. Wash. June 21, 2012) ("To the extent that Defendants believe that a court order is required to trigger their obligation to disclose, they may consider this ruling to constitute that court order.").

At the state level, the Oregon Consumer Identity Theft Protection Act, ORS §§ 646A.600 *et seq.*, provides similar protections for a consumer's personal information. This law also provides that "[a] person that owns, maintains or otherwise possesses data that includes a

consumer's personal information that the person uses in the course of the person's business" complies with the law's requirement to safeguard a consumer's personal information when that person complies with the GLBA. ORS 646A.622(2)(b). Thus, to the extent that Bank of America delivers to Plaintiffs the information ordered by the Court in this Opinion and Order, *i.e.*, pursuant to judicial process, the Bank will be in compliance with its federal and state obligations under the GLBA and the Oregon Consumer Identity Theft Protection Act.

As discussed more fully below and under the schedule and other conditions discussed below, the Court hereby orders Bank of America to review relevant information in its electronic records and any other information (electronic or otherwise) in its possession, custody, or control that may be needed to identify any nonemployees who were or appear reasonably likely to have been present in the Parkrose Branch on August 1, 2019 at any time between 10:15 a.m. and 11:15 a.m. and to provide to Plaintiffs' counsel, in the form of an interrogatory answer, with the names, last known telephone numbers, last known addresses, and last known email addresses of all such persons. Bank of America need not—and shall not—provide any further nonpublic information about those persons. Plaintiffs' counsel may then contact those persons, but shall not otherwise disclose, disseminate, or publish the information about those persons that Plaintiffs' counsel receives from Bank of America.

The Court is mindful that the persons so identified are not parties in this lawsuit, may not have relevant information, or may not want to speak with Plaintiffs' counsel. But it is also reasonable to conclude that these people may have relevant information. As the late U.S. District Judge Marvin E. Frankel wrote: "Trials occur because there are questions of fact. In principle, the paramount objective is the truth." Marvin E. Frankel, *The Search for Truth: An Umpireal View*, 123 U. Pa. L. Rev. 1031, 1033 (1975). With few exceptions that are not relevant here, a

witness to a disputed event has a duty to provide his or her testimony when called upon to do so in a lawsuit. This case presents just such a circumstance.

**C. The Health Concerns of Bank of America's Employees**

Bank of America states that compiling the information that Plaintiffs seek is no easy feat. According to the Bank, to identify these customers, the Bank will need to try to match account records from the teller deposit slips at the Parkrose Branch that morning and pull ATM records (and attempt to determine which authorized user on a particular account was involved in a particular transaction). The Bank also states that it will need to analyze every account opened at the Parkrose Branch on the morning of August 1, 2019, as well as any other business transacted there by private bankers that morning. The Bank adds that employees working at the Parkrose Branch on the morning of August 1, 2019 often worked at different branches. Thus, the Bank explains, this process would require the Bank to locate and contact many employees to review the video footage to try to identify these customers—all during an unprecedented time in our country when individuals are being ordered in Oregon (and elsewhere) to shelter in place and only undertake essential work.

The Court understands these constraints and concerns and will attempt to accommodate them. As a result, all that the Court is ordering the Bank to do at this time is gather, compile, and preserve all necessary records, electronic and otherwise (if there are any relevant nonelectronic records), so that the Bank can later ask its employees to perform the work needed to provide the required information to Plaintiffs' counsel when it is safe. The Bank must gather, compile, and preserve this information at this time, however, to ensure that relevant and responsive information is not inadvertently lost. But the bulk of the labor-intensive work can wait.

As discussed more fully in the next section, the Court expects that the Bank will be able to perform the necessary work in July and August. For this reason, not later than August 31,

2020, absent further order of the Court, the Bank shall provide Plaintiffs' counsel, in the form of an interrogatory answer, with the names, last known telephone numbers, last known addresses, and last known email addresses of all nonemployees who were or appear reasonably likely to have been present in the Parkrose Branch on August 1, 2019 at any time between 10:15 a.m. and 11:15 a.m.

The Court understands that this timing may present Plaintiffs with a dilemma. On the one hand, Plaintiffs may wish to depose relevant witnesses, including Ms. Adair and other Bank employees, sooner rather than later, while memories are still relatively fresh. On the other hand, Plaintiffs may learn information from other witnesses not discovered until after August 31, 2020 that Plaintiffs may want to use in their depositions of Ms. Adair or other Bank employees. If Plaintiffs choose to depose a witness before August 31st and later discover additional information from persons of whom Plaintiffs were unaware until after the Bank's disclosures due on August 31st, Plaintiffs may ask the Court to order that any depositions taken before August 31st be reopened. Upon a showing of good cause under these circumstances, the Court anticipates allowing those depositions to be reopened.

**D. Bank of America's Anticipated Motion Challenging Plaintiffs' Standing**

Bank of America has stated that it intends to move to dismiss Mr. Tennell's civil rights claim under 42 U.S.C. § 1981 because he personally had no contractual relationship with the Bank and thus lacks standing to assert that claim. The Bank has also stated that it intends to move to dismiss WCL's claim under that statute because, the Bank contends, § 1981 only provides a cause of action for natural persons and thus the corporate entity WCL lacks standing to assert a claim under that law. Indeed, the Court has already set a briefing and argument schedule for these anticipated motions. The Bank's motion and opening brief is due not later than

June 11, 2020, and the Court has scheduled oral argument for July 27, 2020. Thus, the Court will likely resolve standing sometime in August.

The Bank has asked that it not be required to produce the contact information, at least until after the Court resolves Plaintiffs' standing to bring their federal claim. The Court will accommodate the Bank's request, even though the Court notes that if the Bank were to prevail on this issue (a question about which the Court expresses no opinion at this time), such a ruling would likely not affect Plaintiffs' common law claim or state statutory claim. In any event, based on the disclosure deadline of August 31, 2020, this matter of timing will likely resolve itself.

**E. The Photograph of Ms. Adair**

The video provided by Bank of America to Plaintiffs contains a still image (a photograph derived from the video) of Ms. Adair. Plaintiffs want to show that image to witnesses or potential witness to determine whether Ms. Adair was the person whom those witnesses observed or heard on August 1, 2019, or with whom those witnesses interacted on other occasions. The Bank, however, has designated the entire video, including the photograph, as "Confidential" under the PO. The Bank objects to any modification of the PO to accommodate Plaintiffs' request.

The PO provides, in relevant part: "Use of any information or documents labeled 'Confidential' or 'Attorneys' Eyes Only' and subject to this Protective Order, including all information derived therefrom, shall be restricted solely to the litigation of this case and shall not be used by any party for any business, commercial, or competitive purpose." PO, ¶ 2. Plaintiffs' intended use of the photograph of Ms. Adair is consistent with this limitation. The PO, however, further states: "Use of any information, documents, or portions of documents marked 'Confidential,' including all information derived therefrom, shall be restricted solely to the following persons, who agree to be bound by the terms of this Protective Order, unless additional persons are stipulated by counsel or authorized by the Court." PO, ¶ 7. The list that follows does

not include third party witnesses or potential witnesses unless they are current employees of a party. *Id*. Thus, the PO restricts Plaintiffs from showing the photograph of Ms. Adair to bank customers, WCL's former employees, and others who may have had bank interactions with her.

Plaintiffs seek an order "de-designating" the confidential status of that photograph. The PO provides: "Nothing in this Protective Order shall prejudice any party from seeking amendments to expand or restrict the rights of access to and use of confidential information, or other modifications, subject to order by the Court." PO, ¶ 18. It further states: "Regardless of which party files the motion, the party seeking to protect a document from disclosure bears the burden of establishing good cause for why the document should not be disclosed." PO, ¶ 11. Thus, the burden is on the Bank to show good cause why Plaintiffs should not be allowed to show the photograph of Ms. Adair to witnesses and potential witnesses.

Bank of America offers two primary arguments for keeping the photograph of Ms. Adair confidential. First, the Bank argues that courts have long recognized the confidential nature of bank surveillance videos and still photographs derived from those videos to ensure the security and safety of banking facilities, including bank branches like the Parkrose Branch. *See, e.g.*, *Ford v. Dep't of Justice*, 208 F. Supp. 3d 237, 254 (D.D.C. 2016) (affirming FBI's decision to withhold bank surveillance footage from response to FOIA request and commenting that "disclosure of this information could [] 'provide criminals the necessary information to circumvent the very purpose of a bank surveillance system, making banks more vulnerable to bank robberies and/or other criminal activity, and therefore circumvent the law'"). The Bank adds that even still shots must be protected because they can "show where a camera is located" and "reveal the exact angle of each camera, the surveillance coverage of each camera, and the number of cameras within the bank." *Id*. at 253. In general, the Court agrees with these points.

The Court has reviewed the specific photograph at issue, which Plaintiffs have attached as Exhibit B to Plaintiffs' Motions to Compel and to De-Designate. *See* ECF 29-2 (under seal). Although it does not appear to the Court that this photograph can provide criminals with any information useful in circumventing the purpose of a bank surveillance system, the Court will err on the side of caution and protecting bank security. Accordingly, before Plaintiffs may use this photograph, Plaintiffs must first "cut around" the image of the person depicted (presumably, Ms. Adair) and delete or obscure all background. After Plaintiffs do this, they will be left with only the specific image of the person depicted. That image, by itself, will not show where a camera is located, reveal the exact angle of a camera, or convey the surveillance coverage of a camera. With these modifications, the Bank's first concern will have been sufficiently satisfied.

The second argument offered by the Bank seeks to prevent the harassment and embarrassment of Ms. Adair. As the Bank explains, a court generally must consider the privacy interests of third parties in evaluating whether to disclose information and must balance a party's need for the information against the privacy right asserted. *DeArmand v. City of Antioch*, 2009 WL 1704686, at *2 (N.D. Cal. 2009). The Bank states:

> [P]ublic disclosure of Ms. Adair's image in the context of a case in which she has been alleged to have acted in a racist manner could result in considerable reputational damage, embarrassment, and harassment. Indeed, in this day of social media, the public release of her image would render it impossible to control the dissemination or distribution of her image and photograph to the public in connection with Plaintiffs' allegations of racist treatment at the Bank.

ECF 38 at 8 (internal page 7).

Although the Federal Rules of Civil Procedure permit liberal discovery, it "is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). "[D]iscovery also may

seriously implicate privacy interests of litigants and third parties." *Id*. at 34–35; *see also Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) ("A party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted.").

In deciding whether to modify the PO to allow Plaintiffs to show the photograph of Ms. Adair (albeit with all background removed) to witnesses and potential witnesses, the Court considers these factors:

> 1. whether the modification is being sought for a legitimate purpose or for an improper purpose;
>
> 2. whether privacy interests are implicated, including the interest in avoiding embarrassment of a party or third party;
>
> 3. whether the modification will promote fairness and efficiency in discovery or trial;
>
> 4. the importance of the issues being adjudicated; and
>
> 5. whether any additional modifications will reasonably protect implicated privacy interests while not unreasonably interfering with legitimate needs and proper purposes.

This is a non-exhaustive list of the potential factors that a court may consider when asked to modify a protective order (or even to enter a protective order in the first place). *See generally Foltz*, 331 F.3d at 1130; *Miscellaneous Docket Matter #1 v. Miscellaneous Docket Matter #2*, 197 F.3d 922, 925 (8th Cir. 1999). These are the five specific factors, however, that the Court finds most germane to the pending dispute.

The Court finds that Plaintiffs seek permission to show the photograph of Ms. Adair for a legitimate purpose. Plaintiffs' and Defendant's versions of what happened inside the Parkrose Branch during the morning of August 1, 2019 differ in a material way. For example, the Bank states that Mr. Tennell "came into [the] Parkrose [Branch] that day agitated and looking for a

fight." ECF 38 at 7 (internal page 6). Plaintiffs deny the Bank's assertion and place the blame on Ms. Adair's racial animus. ECF 42. This will likely be one of the most important factual disputes to resolve at trial.

The Court also finds that Ms. Adair's privacy interests are implicated, including her interest in avoiding embarrassment and harassment. This finding, however, is qualified in several respects. First, the Bank has asserted potential prejudice to Ms. Adair in conclusory terms and has not shown any specific harm that is likely to occur. Also, Ms. Adair is a third party to this dispute only in the most narrow and technical sense of that term. She is (or was) the branch manager at the Bank's Parkrose Branch and is likely the only officer, employee, or agent of the Bank on which the Bank's liability can be based. Generally, third parties are disinterested in the outcome of a dispute, and the outcome of a dispute rarely turns on what a third party did or said before a lawsuit was filed. Thus, Ms. Adair's role in this case is closer to a party than to the role of a typical third party. Still, to the extent appropriate, the Court will attempt to fashion relief in the pending motions that minimizes any embarrassment, risk of harassment, or other potential unfair prejudice to Ms. Adair.[2]

[2] The Bank also briefly discusses another potential prejudice that might result from de-designating the photograph of Ms. Adair. The Bank argues that showing potential witnesses only a single image, the photograph of Ms. Adair, and no photographs of anyone else, might distort the memories of those witnesses. The Bank analogizes this to a biased identification in a criminal case. The Court rejects the Bank's argument for several reasons. First, it is conclusory and speculative. *See Foltz*, 331 F.3d at 1130 (stating that to show good cause for a protective order a party must show that "specific prejudice or harm will result if no protective order is granted"). Second, the Court can adequately address any potential unfair prejudice by allowing cross-examination on this point or, before trial, by considering a motion *in limine* or motion for preliminary hearing under Rule 104 of the Federal Rules of Evidence. Further, even in a criminal case, although courts generally view with suspicion a single-photograph display, it is not *per se* unconstitutional. *See Manson v. Brathwaite*, 432 U.S. 98, 116-17 (1977).

The modification sought by Plaintiffs also will promote efficiency and fairness in discovery and trial. If a person was in the Bank on the morning of August 1, 2019, and believes that he or she observed or heard something that might be relevant, it will promote efficiency and fairness to learn sooner rather than later whether that person observed or heard Ms. Adair, rather than someone else. Showing that witness or potential witness a photograph of Ms. Adair, especially as she looked while in the Parkrose Branch during the morning of August 1, 2019, is both efficient and fair.

In addition, the issues being adjudicated in this lawsuit are important and serve the public interest more than just resolving a private dispute between private parties. The federal civil rights law on which Plaintiffs' first claim is based traces its origin to the Civil Rights Act of 1866, which was the first federal law to affirm that all United States citizens are equally protected under the law. The legislation was first passed by Congress in 1865 but was vetoed by President Andrew Johnson. Congress again passed the legislation in 1866, and President Johnson again vetoed the bill. Congress then overrode the veto by more than a two-thirds vote in each chamber, allowing the bill to become law without a presidential signature. More recently, Congress reaffirmed the basic principles of the 1866 law, with some amendment, when Congress passed the Civil Rights Act of 1991. The lawsuit presents important issues and raises important questions.

Finally, although Plaintiffs ask the Court simply to "de-designate" the photograph's "confidential" status, there may be a more modest modification that will reasonably protect Ms. Adair's privacy interests while not unreasonably interfering with Plaintiffs' legitimate needs and proper purposes. In their reply, Plaintiffs propose an alternative to wholesale de-designation. Plaintiffs state:

> Plaintiffs would additionally agree not to post the Image on the Internet, send the Image through external email, or generally disseminate the Image. Rather, at all times, the Image will remain in the presence of counsel, who will only use it for purposes of obtaining information relevant to the claims in this lawsuit. Potential witnesses will be shown the image and will not be allowed to take a picture of it or copy it in any way.

ECF 41 at 5-6. Plaintiffs' proposal is reasonable. The Court hereby modifies the PO to permit Plaintiffs to use the photograph of Ms. Adair in this way and subject to these limitations.

**CONCLUSION**

The Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motions to Compel and to De-Designate (ECF 29) and Defendant's Motion for Protective Order (ECF 30) as stated in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 4th day of May, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge